PUERTO RICAN LEGAL DEFENSE AND EDUCATION FUND, INC., and Evelyn Corchardo, Plaintiffs,

v.

David GANTT, Co–Chairman of the New York State Legislative Task Force on Demographic Research and Reapportionment; Dean Skelos, Co–Chairman of the New York State Legislative Task Force on Demographic Research and Reapportionment; New York State Task Force on Demographic Research and Reapportionment; Saul Weprin, Speaker of the Assembly of the State of New York; Ralph Marino, Majority Leader of the New York State Senate; Mario Cuomo, Governor of the State of New York; Stanley Lundine, Lieutenant Governor of the State of New York; the Senate of the State of New York; the Assembly of the State of New York; the Board of Elections of the State of New York, Defendants.

Michael T. WARING, Plaintiff,

v.

David GANTT, Individually and as Co–Chairman of the Legislative Task Force on Demographic Research and Reapportionment; Dean Skelos, Individually and as Co–Chairman of the Legislative Task Force on Demographic Research and Reapportionment; the New York State Task Force on Demographic Research and Reapportionment; the Senate of the State of New York; the Assembly of the State of New York; the Board of Elections of the State of New York; Ronald Starkweather, Individually and as Commissioner of the Board of Elections of the County of Monroe; M. Betsy Relin, Individually and as Commissioner of the Board of Elections of the County of Monroe, Defendants.

Nos. CV–92–1521(SJ), CV–92–1776(SJ).

United States District Court, E.D. New York.

June 26, 1992.

Before: PRATT, Circuit Judge, and MARTIN and JOHNSON, District Judges.

OPINION

PER CURIAM:

In order to aid the court in its task of redistricting the State of New York from 34 to 31 congressional districts, as mandated by the 1990 federal census, this three-judge court appointed the Hon. Frederick B. Lacey as special master on May 12, 1992. Two weeks later, on May 26, 1992, Judge Lacey presented a plan of 31 congressional districts with a report recommending that this court adopt the plan as submitted. For the following reasons, this three-judge court agrees with Judge Lacey and conditionally adopts his proposed plan as the congressional districts for New York based on the 1990 federal census. This opinion includes the three-judge court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

I. PROCEDURAL HISTORY

A. *The 1990 census, legislative deadlock and judicial intervention.*

In 1990, the Bureau of the Census conducted a census of the United States. *See* U.S. Const. art. I, § 2, cl. 3. When the results of this census were released, in early 1991, it became apparent that New York's population had not grown as fast as had other states'; as a result, New York lost three seats in the House of Representatives, reducing its congressional delegation from 34 to 31 members. The New York Legislative Task Force on Demographic Research and Reapportionment (Task Force) was charged with the task of preparing a redistricting plan for New York's congressional seats; however, because of political differences, the Task Force, which had been "studying, discussing and negotiating the issue for nearly a year", was "not even close" to an agreement as of March 24, 1992. Kevin Sack, *Albany at Impasse in Redrawing Map of House Districts,* N.Y. Times, Mar. 25, 1992, at A1 (referenced in complaint of Puerto Rican Legal Defense and Education Fund (PRLDEF) at ¶ 26).

On March 26, 1992, one of these consolidated actions, *Waring v. Gantt,* was filed in the United States District Court for the Western District of New York. That same day, *Reid v. Marino,* Index no. 9567/92, was commenced in the New York Supreme Court, Kings County. On March 31, the other of these consolidated actions, *PRLDEF v. Gantt,* was filed in the United States District Court for the Eastern District of New York. Three-judge panels were appointed by the Chief Judge of the Second Circuit in both the *PRLDEF* and the *Waring* actions. *Waring,* however, was transferred to this court by the three-judge court convened in the Western District (Circuit Judge Van Graafeiland, Chief District Judge Telesca, and District Judge Larimer) on April 9, 1992; *Waring* and *PRLDEF* were thereafter consolidated pursuant to Fed.R.Civ.P. 42(a).

Certain of the state court defendants removed the *Reid* action to this court on April 7, 1992; since all defendants did not join in this motion, *Reid* was remanded to the Supreme Court of New York, Kings County on April 17.

On May 5, 1992, this court issued a memorandum and order which, *inter alia,* declined to abstain in favor of the state court proceeding and granted various parties' motions to enjoin the parties in the state court from proceeding with that litigation. *PRLDEF v. Gantt,* 796 F.Supp. 677 (E.D.N.Y.1992). That injunction was stayed by order of the United States Supreme Court on May 13, 1992. *Gantt v. Skelos,* —— U.S. ——, 112 S.Ct. 1926, 118 L.Ed.2d 534 (1992).

B. *Appointment of Special Master Lacey.*

As it became obvious that the political processes had broken down, it became the "unwelcome obligation" of this three-judge court to supervise development of a redistricting plan that would satisfy the requirements of federal law. *Conner v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977). By order of May 12,

1992, this court appointed the Hon. Frederick B. Lacey as Special Master, pursuant to Fed.R.Civ.P. 53. We instructed the Special Master, *inter alia*, as follows:

1. The Special Master shall be empowered and charged with the duty to prepare and recommend to the court for adoption a redistricting plan for the State of New York, dividing the state into thirty-one congressional districts in accordance with the 1990 federal census.

2. In developing the plan, the Special Master shall adhere to and, where possible, reconcile the following guidelines:

(a) Districts shall be of substantially equal population, compact, and contiguous.

(b) The plan shall comply with 42 U.S.C. § 1973(b) and with all other applicable provisions of the Voting Rights Act.

3. The court is acutely aware of the pressing need for having a redistricting plan in place as soon as possible, preferably by June 9, 1992, which is the earliest date established by the New York Election Law for obtaining signatures on designating petitions. Accordingly, the court requests the Special Master to submit his plan for redistricting to the court on May 26, 1992, or as soon thereafter as he is able to complete a plan that meets the requirements of the law and of this order.

*PRLDEF v. Gantt*, No. CV–92–1521(SJ), at 2–3 (E.D.N.Y. May 12, 1992) (order appointing special master).

## C. *Work of the Special Master.*

In view of the limited time available to him, Special Master Lacey immediately determined that it would be necessary to hire an expert familiar with the process of districting, the comparison of districting plans, the requirements of the Voting Rights Act, and racial and partisan patterns in voting. After contacting numerous persons familiar with these processes, the Special Master retained Professor Theodore S. Arrington of the Department of Political Science at the University of North Carolina–Charlotte. The Special Master also retained James Ford, a candidate for the Master of Public Policy and Administration degree at Columbia University, to assist Dr. Arrington. Dr. Ester Fuchs of Barnard College was later retained by the Special Master as a consultant on the political and ethnic geography of New York.

Pursuant to his authority under Fed. R.Civ.P. 53(c) and this court's order, Special Master Lacey invited the parties, intervenors, and numerous other interested persons to attend a meeting on May 18, 1992, to address their concerns. Approximately sixty people attended that meeting, which included presentations of various redistricting proposals, responsive comments, and questioning by the Special Master.

On May 26, 1992, Special Master Lacey filed his proposed plan with the clerk of the United States District Court for the Eastern District of New York. Consistent with the order appointing Special Master Lacey, this court received written objections to the proposed plan, and convened a hearing on June 3, 1992 to hear argument on those objections as well as on other matters pertinent to this court's redistricting task.

## D. *The State Supreme Court and its Work.*

Once the *Reid* action had been remanded to the New York Supreme Court, that court appointed a panel of three "referees", which engaged in its own redistricting effort. The result of the referees' work was another plan of redistricting, which was distributed on June 4. In a five-page "Memorandum" order and judgment, a justice of the New York Supreme Court, Kings County, drew the following conclusions:

At the June 5th hearing, all parties and subsequent intervenors were given an opportunity to comment on the merits of the redistricting plan proposed by the referees. The court recognizes that no reapportionment plan can be perfect in every detail, and none can be drawn that will be satisfactory to everyone. However, upon listening to all of the comments and suggestions on various aspects of the plan, and based upon the

court's own examination of the proposed plan, the court finds the plan submitted by the referees to be complete and valid under the constitutions of the United States and the State of New York as well as the Federal Voting Rights Act. The court further concludes that this plan is the only one presently before any court that fully comports with these requirements and other applicable criteria as set forth in the referees' report. The court adopts the plan in its entirety, unchanged, as the Congressional Reapportionment Plan for the State of New York and hereby promulgates and establishes it to govern the election of Members of Congress at the November 1992 election and subsequent elections.

*Reid v. Marino*, No. 9567/92, slip op. at 3–4 (N.Y.Sup.Ct., Kings Cty., June 8, 1992). The judgment of the New York Supreme Court appears to have been largely mooted by the legislature's passing of the referees' redistricting plan on June 9, 1992, and the governor's approval thereof.

E. *Approval of the Special Master's Plan.*

On June 11, 1992, this three-judge court entered the following order:

On June 3, 1992, this three-judge court heard objections to and arguments concerning the congressional redistricting plan submitted by Special Master Frederick B. Lacey. On that date, respective counsel for the senate majority and for the assembly majority both represented to us that by Wednesday, June 10, 1992, the legislature would approve (1) a congressional redistricting plan other than the one submitted by the Special Master, and (2) an amendment to the New York Election Law that would provide, *inter alia,* that the process of gathering signatures on designating petitions shall begin on July 9, 1992, rather than June 9, 1992. *Compare* N.Y.Elec. Law §§ 6–134(6) *and* 6–158(1) (McKinney Supp.1992).

This court indicated, on June 3, 1992, that it would, soon after June 10th, enter an appropriate order with respect to the interrelationship between, and effect of, the Special Master's plan and the state plan.

Both houses of the state legislature have now approved a bill adopting a reapportionment plan and a bill adopting the promised changes in the election laws. Both bills have now been signed by the governor.

"A decree of the United States District Court is not within reach of Section 5 of the Voting Rights Act", *Connor v. Johnson,* 402 U.S. 690, 691, 91 S.Ct. 1760, 1761, 29 L.Ed.2d 268 (1971) (*per curiam*), thus, preclearance of the Special Master's plan by the Department of Justice is not required. However, a legislatively-approved plan requires preclearance by the Department of Justice, *see, e.g., McDaniel v. Sanchez,* 452 U.S. 130, 149, 101 S.Ct. 2224, 2235, 68 L.Ed.2d 724 (1981). Of course, preclearance of the state plan may not occur, or it may be delayed. Since all parties agree that a redistricting plan must be in place before the signature-gathering process starts, so that candidates can know the boundaries of the districts they hope to represent, we hereby ORDER the following:

1. The Special Master's plan as submitted is hereby accepted and approved by this court as an appropriate and proper apportionment of New York's 31 congressional districts.

2. Subject to further order of this court, if the plan adopted by the state legislature, or some duly approved modification thereof is not in place, *i.e.,* both adopted as law in the State of New York and precleared, by 5:00 pm on July 8, 1992, then the Special Master's plan shall operate as the plan for congressional districts for the State of New York for the 1992 elections.

3. A written opinion setting forth the court's reasons for not holding any further hearings, for approving the Special Master's plan, and for conditionally establishing the Special Master's plan at this time will be filed in the near future.

In view of some of the issues raised by the parties' submissions to this court, we invite any interested parties to submit briefs, by June 19, 1992, on the issue of

the extent to which, if at all, this court may and should pass on the legality of the state plan.

*PRLDEF v. Gantt,* No. CV–92–1521 (SJ) (E.D.N.Y. June 11, 1992).

## II. APPLICABLE CONSTITUTIONAL AND STATUTORY LAW

■ Under applicable federal law, redistricting plans must comply with two "mandatory" criteria: population equality (or "one person, one vote"), *see Kirkpatrick v. Preisler,* 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1228–29, 22 L.Ed.2d 519 (1969) *and Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 529–30, 11 L.Ed.2d 481 (1964), and racial fairness. *See White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). Additionally, the "permissive" criteria of contiguity, compactness, respect for traditional boundaries, maintenance of communities of interest, and encouraging party competition may also be considered. *See generally O'Sullivan v. Brier,* 540 F.Supp. 1200, 1203 (D.Kan.1982).

### A. *"Mandatory" criteria.*

#### 1. Population equality.

Article I, § 2 of the United States Constitution provides, in pertinent part:

> The House of Representatives shall be composed of Members chosen by the People of the several States, and * * * shall be apportioned among the several States * * * according to their respective Numbers * * *.

U.S. Const. art. I, § 2, cl. 3 (amended 1865). The United States Supreme Court has interpreted this constitutional command to mean that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders,* 376 U.S. at 7–8, 84 S.Ct. at 529–30.

■ The "as nearly as is practicable" standard "requires that the State make a good-faith effort to achieve precise mathematical equality." *Kirkpatrick v. Preisler,* 394 U.S. at 530–31, 89 S.Ct. at 1228–29. Congressional redistricting plans are not *per se* unconstitutional because a smaller population deviation might be possible;

however, all population variances from the ideal, no matter how small, must be justified on legally-cognizable grounds. *See Karcher v. Daggett,* 462 U.S. 725, 730, 103 S.Ct. 2653, 2658, 77 L.Ed.2d 133 (1983) (quoting *Kirkpatrick v. Preisler,* 394 U.S. at 531, 89 S.Ct. at 1229). Legally-cognizable grounds for population variances, the Supreme Court has said, are where the variances "are unavoidable despite a good-faith effort to achieve absolute equality", or where justification (such as state requirements of compactness and contiguity) is shown. *Karcher v. Daggett,* 462 U.S. at 730–31, 103 S.Ct. at 2658–59.

#### 2. Racial fairness.

##### a. *Constitutional provisions.*

■ The equal protection clause of the fourteenth amendment guarantees the opportunity for equal participation by all voters, and redistricting plans that do not achieve fair and effective representation for all citizens impair the basic and fundamental rights secured by this amendment. *Reynolds v. Sims,* 377 U.S. 533, 566, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506 (1964). Thus, the adoption of electoral boundaries must serve the interests of the entire community and cannot operate to cancel out the voting strength of racial or ethnic minorities. *Id.* at 565–66, 84 S.Ct. at 1383–84. *See also Karcher v. Daggett,* 462 U.S. at 747–48, 103 S.Ct. at 2668–69 (Stevens, J., concurring).

■ Similarly, the fifteenth amendment prohibits the denial of voting rights on the basis of race, color, or previous condition of servitude. When an identifiable racial or ethnic group is singled out for discriminatory treatment which interferes with the right to vote, the fifteenth amendment is violated. *See Gomillion v. Lightfoot,* 364 U.S. 339, 340, 346, 81 S.Ct. 125, 126, 129, 5 L.Ed.2d 110 (1960) (change in Tuskegee, Alabama's city boundaries "from a square to an uncouth twenty-eight-sided figure" excluding virtually all of the city's black voters violated the fifteenth amendment).

### b. *The Voting Rights Act.*

In addition to satisfying the above constitutional requirements, congressional redistricting plans must also comply with the Voting Rights Act of 1965, as amended in 1970, 1975, and 1982. *See* 42 U.S.C. § 1973 *et seq.* The act is intended to facilitate implementation of the fifteenth amendment, *i.e.*, to protect citizens from the denial or abridgement of the right to vote based on race or color. *NAACP v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973); *South Carolina v. Katzenbach*, 383 U.S. 301, 315, 86 S.Ct. 803, 811, 15 L.Ed.2d 769 (1966) (primary purpose of the act is "to rid the country of racial discrimination in voting").

### i. Section 2.

Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, is divided into two subsections. Subsection 2(a) prohibits any voting procedure that "results in a denial or abridgement of" the voting rights of a person on account of race, color, or membership in a language minority. 42 U.S.C. § 1973(a). Subsection 2(b) provides that a violation of subsection 2(a) is established by showing that "based on the totality of the circumstances", members of a class protected under subsection 2(a) "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

The leading case construing § 2 of the act is *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Applying the 1982 amendments to § 2, the *Gingles* court used a "totality of the circumstances" test in holding that "a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors'." *Id.* at 44, 106 S.Ct. at 2763 (quoting S.Rep. No. 99–417, 97th Cong., 2d Sess. 27, *reprinted in* 1982 U.S.C.C.A.N. 177, 205). A violation exists where the political process and opportunities to elect representatives of their choice are not equally accessible to members of a protected group and to other members of the electorate. *Chisom v. Roemer*, —— U.S.

——, ——, 111 S.Ct. 2354, 2365, 115 L.Ed.2d 348 (1991).

■ The typical § 2 challenge is an assertion of minority vote dilution. Minority voting strength is diluted in violation of the act when a redistricting plan operates to minimize·or cancel out the voting strength of minority groups. *Hastert v. State Bd. of Elections*, 777 F.Supp. 634, 646 (N.D.Ill. 1991). Minority vote dilution can occur in two ways: either by fragmenting large concentrations of minority populations and dispersing them into separate electoral districts, or by concentrating minorities into districts where they constitute an excessive majority. *Thornburg v. Gingles*, 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11 (citing Engstrom & Wildgen, *Pruning Thorns From the Thicket: An Empirical Test of the Existence of Racial Gerrymandering*, 2 Legis.Stud.Q. 465, 465–66 (1977)). Thus, § 2 is violated where a minority's vote is either too "fragmented" or too "packed"; a plan will survive § 2 scrutiny only where a proper balance is struck between the two extremes.

■ In *Gingles*, the Court established three "necessary preconditions" to sustain a § 2 claim in multi-member districts:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. * * * Second, the minority group must be able to show that it is politically cohesive. * * * Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed * * *—usually to defeat the minority's preferred candidate.

*Thornburg v. Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766–67. A group that meets these threshold conditions is entitled to have its claim considered on the merits under the "totality of the circumstances" test prescribed in § 2(b) of the Voting Rights Act, 42 U.S.C. § 1973(b). Although the Court in *Gingles* specifically reserved the question of whether the three quoted preconditions apply to challenges to single-

member districts, *see id.* at 50 n. 16, 106 S.Ct. at 2766 n. 16, several district and circuit courts have applied the *Gingles* prerequisites to claims challenging single-member districts, as we have here. *See, e.g., Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1162 (5th Cir.1981); *Hastert v. State Bd. of Elections,* 777 F.Supp. at 649–50; *Jeffers v. Clinton,* 730 F.Supp. 196, 205 (E.D.Ark.1989), *aff'd,* — U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991); *Neal v. Coleburn,* 689 F.Supp. 1426, 1435 (E.D.Va.1988). *But see Armour v. State of Ohio,* 775 F.Supp. 1044, 1051 (N.D.Ohio 1991) (rejecting *Gingles* as inapplicable to single-member districts).

### (A) *Size and compactness.*

*Gingles* requires that the minority group be "sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766.

In evaluating whether a minority group is "sufficiently large" to constitute a majority, most courts have held that it is appropriate to consider the percentage of voting age population (VAP) in the district rather than the total minority population, in recognition of the "higher non-voting age population percentages, lower voter registration and lower voter turnout found in minority communities." *Hastert v. State Bd. of Elections,* 777 F.Supp. at 647 n. 20 (citing *Ketchum v. Byrne,* 740 F.2d 1398, 1413–15 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985)); *see generally Dickinson v. Indiana State Election Bd.,* 933 F.2d 497, 503 (7th Cir.1991); *United States v. County Comm'n Dallas County, Ala.,* 850 F.2d 1433, 1438–40 (11th Cir.1988), *cert. denied,* 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989); *McDaniels v. Mehfoud,* 702 F.Supp. 588, 592 (E.D.Va.1988).

Consistent with its jurisprudence in other areas involving the Voting Rights Act, the Supreme Court has declined to adopt bright-line formulae for determining whether the VAP percentage of a minority group in a district is so low that a court should suspect dilution of minority voting strength. Courts have held that more than simple majorities (51 percent) are required to create "safe" majority-minority districts. *See Hastert v. State Bd. of Elections,* 777 F.Supp. at 647; *Neal v. Coleburn,* 689 F.Supp. 1426, 1437 (E.D.Va.1988). The court in *Hastert* noted that a 60 percent VAP is generally regarded as the threshold for creating a "safe" minority district, 777 F.Supp. at 647 n. 20, but approved a plan in which the VAP of a proposed African-American district fell slightly below that threshold. *Id.* at 648 (approving minority districts where VAP was around 59 percent). *See also Solomon v. Liberty County, Fla.,* 865 F.2d 1566, 1574 (11th Cir.1988) (51% VAP in African-American district was effective under the *Gingles* "totality of the circumstances" approach), *on rehearing in banc,* 899 F.2d 1012 (11th Cir.1990) (same result as original panel), *cert. denied,* — U.S. ——, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991).

Even higher VAP percentages may be required in Hispanic districts to account for their even lower citizenship ratio, lower voter turnout, and lower voter registration. *Ketchum v. Byrne,* 740 F.2d at 1414. The principle which motivates each of these cases is, as the Supreme Court continually stresses, that resort to absolutes is inappropriate in evaluating minority voting strengths. Numerous other cases also illustrate that courts should consider the degree of racial polarization in voting, *e.g., Gunn v. Chickasaw County, Miss.,* 705 F.Supp. 315, 320–22 (N.D.Miss.1989), minority voter turnout and voter registration, *e.g., Hastert v. State Bd. of Elections,* 777 F.Supp. at 647 n. 20, and the success of minority candidates in seeking office within the jurisdiction. *Gunn v. Chickasaw County, Miss.,* 705 F.Supp. at 320–22. *Gunn* also illustrates, however, that a too-low VAP can support a claim of dilution. *Id.* (noting that 36% total population and 31% VAP of African-Americans, "[i]n light of the extreme racial polarization in voting", resulted in vote dilution in violation of § 2).

Similarly, courts have reached varying conclusions with respect to the "geographically compact" requirement of *Gingles.*

Some courts have found geographical compactness when minority population is concentrated in one discrete area, see, e.g., Campos v. City of Baytown, 840 F.2d 1240, 1244 (5th Cir.1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); still others have found the criterion satisfied where discrete but dense minority populations from two areas are linked. See, e.g., Hastert v. State Bd. of Elections, 777 F.Supp. at 649 (Hispanic district had population "clustered into two dense enclaves" on opposite sides of town, connected by a "narrow corridor" and forming a "C" shape). Yet other courts have considered a "community of interests" (which is often considered as a "permissive criterion") in the "geographically compact" analysis. See, e.g., Hastert v. State Bd. of Elections, 777 F.Supp. at 649. The "community of interests" has been defined by one court by inquiring whether the minority groups within the proposed districts would have the ability to "relate to each other and their representatives", and whether the representatives would have the ability "to relate effectively to their constituency". Wilson v. Eu, 1 Cal. 4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545, 553 (1992).

(B) *Political cohesion/bloc voting.*

The second *Gingles* precondition for sustaining a § 2 claim is that the challenging minority group "must be able to show that it is politically cohesive." "Cohesion" in this regard means what it says: "a minority group is politically cohesive if it votes together." *Campos v. City of Baytown,* 840 F.2d at 1244. In reality, however, the second and third *Gingles* preconditions—political cohesion of the minority and bloc voting by the majority—are not inquiries to be made apart from each other, because the central focus of each is on voting patterns. "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Thornburg v. Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769. Even the *Gingles*

court itself treated these factors as interchangeable, *id.* at 52 n. 18, 106 S.Ct. at 2767 n. 18, so we will follow its lead.

Although "there is no simple doctrinal test for the existence of legally significant racial bloc voting", *id.* at 58, 106 S.Ct. at 2770, the Court in *Gingles* was nevertheless able to lay down some general principles for the application of § 2. Noting that such inquiries are necessarily fact-sensitive, Justice Brennan wrote:

> A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting. The amount of white bloc voting that can generally "minimize or cancel" black voters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices * * *; the percentage of registered voters in the district who are members of the minority group; [and] the size of the district[.]

*Thornburg v. Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769 (citations omitted).

ii. Section 5.

Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, is intended to ensure that the protections afforded by § 2 of the Act are in fact available in states, or counties therein, that the United States Attorney General determines are "covered jurisdictions" under § 4(b) of the Act. "Covered jurisdictions" are those states or counties therein which maintained any "test or device", see 42 U.S.C. § 1973b(c), on November 1, 1964 and November 1, 1968, and in which fewer than half of its voting age residents voted or were registered to vote

in the Presidential elections of 1964, 1968, or 1972. 42 U.S.C. § 1973b(b). Three counties in the State of New York—Bronx, Kings, and New York—are covered jurisdictions under § 4(b).

Section 5 requires that any proposed change in voting laws, "practices or procedures", including redistricting plans, affecting covered jurisdictions must be precleared by the United States Attorney General or authorized by a declaratory judgment of a three-judge United States District Court for the District of Columbia prior to implementation of the proposed change. 42 U.S.C. § 1973c. *See also State of Texas v. United States*, 785 F.Supp. 201 (D.D.C.1992) (three-judge court). This preclearance cannot occur unless the submitting jurisdiction shows that the proposed change has no racially-discriminatory purpose or effect. 28 C.F.R. § 51.38(b); *see also* 1975 U.S.C.C.A.N. 774, 781–82.

■ When "the court, because of exigent circumstances, actually fashions the plan itself instead of relying on a plan presented by a litigant", § 5 preclearance is not necessary. S.Rep. No. 94–295, 94th Cong., 1st Sess. 18–19, *reprinted in* 1975 U.S.C.C.A.N. 774, 785. The Supreme Court agrees with this view, *see Connor v. Johnson*, 402 U.S. 690, 691, 91 S.Ct. 1760, 1761, 29 L.Ed.2d 268 (1971) (*per curiam*), as does the Department of Justice, *see* 28 C.F.R. § 51.18(a) (1991) (preclearance not required unless court-drawn plan "reflect[s] the policy choices of the submitting authority"), whose construction of the Voting Rights Act merits considerable deference. *See Presley v. Etowah County Comm'n*, —— U.S. ——, ——, 112 S.Ct. 820, 831, 117 L.Ed.2d 51 (1992). The preclearance requirement is discussed at greater length in part IV of this opinion, *infra*.

■ Despite the absence of a preclearance requirement for court-drawn plans which do not "reflect the policy choices" of the legislators, the Department of Justice and case law have established that a court-drawn plan should be drafted so that it will not "lead to a retrogression in the position of a racial or language minority group with respect to their opportunity to exercise the electoral franchise effectively." 28 C.F.R. § 51.54(a) (citing *Beer v. United States*, 425 U.S. 130, 140–42, 96 S.Ct. 1357, 1363–64, 47 L.Ed.2d 629 (1976)). The United States District Court for the District of Columbia has recently sketched out the following explanation of the burden of proof imposed upon a state in a § 5 preclearance action:

First, it must demonstrate that the redistricting plan does not lead to a retrogression in the position of racial minorities, *see Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363–64, 47 L.Ed.2d 629 (1976); second, the State must demonstrate that the plan is free of a discriminatory purpose. *Richmond v. United States*, 422 U.S. 358, 362, 95 S.Ct. 2296, 2299–2300, 45 L.Ed.2d 245 (1975); *Busbee v. Smith*, 549 F.Supp. 494, 516 (D.D.C.1982), *aff'd mem.*, 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983). Even if a change is "ameliorative," it may violate section 5 if it "so discriminates on the basis of color as to violate the Constitution." *Beer*, 425 U.S. at 141, 96 S.Ct. at 1364.

*State of Texas v. United States*, 785 F.Supp. at 203–04. In short, a redistricting plan must not diminish whatever voting strength protected groups had before redistricting. *Wilson v. Eu*, 823 P.2d at 564.

B. *Permissive criteria.*

■ After complying with federal constitutional and statutory requirements, a redistricting plan may properly balance a "wide array of secondary or equitable criteria". *Good v. Austin*, 800 F.Supp. 551, 554 (E. & W.D.Mich.1992). *See also O'Sullivan v. Brier*, 540 F.Supp. at 1203. Among these various equitable criteria are: compactness, contiguity, preservation of municipal boundaries, maintenance of the cores of existing districts, communities of interest, and political fairness. Indeed, our order appointing Judge Lacey as Special Master specifically directed him to draw districts "of substantially equal population, [which are] compact, and contiguous." *PRLDEF v. Gantt*, No. CV–92–1521 (SJ), slip op. at 2, ¶ 2(a) (E.D.N.Y. May 12, 1992). However, these "permissive" criteria may

be sacrificed in a particular plan in order to comply with the Voting Rights Act or the federal constitution; their enumeration in the case law is simply to guide legislatures as to the criteria that they *may* properly consider in drawing a plan.

## III. THE SPECIAL MASTER'S PLAN

We are satisfied that the Special Master's plan satisfies all of the above criteria. We address each in turn.

### A. *"Mandatory" criteria.*

#### 1. Population equality.

 *Wesberry, Kirkpatrick,* and *Karcher* all teach that "absolute population equality [is] the paramount objective of apportionment". *Karcher,* 462 U.S. at 732, 103 S.Ct. at 2659. The most populous districts (10) in the master's plan have 580,338 people; the least populous (3) have 580,336. This deviation (of .0000034 percent) could scarcely be reduced further; thus, we find and conclude that this deviation represents a good-faith effort on the part of the Special Master to achieve absolute equality. Although the Supreme Court has never fixed a precise numerical standard for permissible deviations, *see Karcher v. Daggett,* 462 U.S. at 731, 103 S.Ct. at 2658; *Kirkpatrick v. Preisler,* 394 U.S. at 530, 89 S.Ct. at 1228, it has noted that "[p]recise mathematical equality * * * may be impossible to achieve in an imperfect world", *Karcher v. Daggett,* 462 U.S. at 730, 103 S.Ct. at 2658, and the Special Master's plan could be improved only by moving one person from three of the 10 larger districts to each of the three districts containing 580,336 persons. However, the census is an imperfect count to begin with, and populations have continued to shift and change since the 1990 census was taken. The Special Master's plan suffers from no relevant mathematical imperfections, and no challenge to the contrary could succeed. This surely is "as near[ ] as practicable" to the ideal, and commendable as well.

#### 2. Racial fairness.

##### a. *Constitutional provisions.*

 There can be no argument—and, indeed, none is made—that the Special Master's plan violates the fourteenth amendment's equal protection clause. On the contrary, the Special Master's virtually-perfect mathematical allocation satisfies the one-person, one-vote standard as best as possible. *See, e.g., Gray v. Sanders,* 372 U.S. 368, 382, 83 S.Ct. 801, 809, 9 L.Ed.2d 821 (1963) (Stewart, J., concurring) ("Within a given constituency, there can be room for but a single constitutional rule—one voter, one vote."). *See also Wesberry v. Sanders,* 376 U.S. 1, 8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964) ("[O]ne man's vote * * * is to be worth as much as another's."). The "zero deviation" required by both the constitution and the Voting Rights Act, however, is sometimes achieved at the expense of other, "permissive", values, such as compactness, contiguity, and communities of interest. *See infra; see generally* Affidavit of Dr. Theodore S. Arrington ¶ 23, at 11.

 Similarly, on this record there is no suggestion, nor could there be, that the Special Master's plan runs afoul of the fifteenth amendment, by intentionally singling out a racial or ethnic group in such a way as to interfere with that group's members' right to vote. *See generally* Laurence H. Tribe, *American Constitutional Law* § 13–8, at 1076–80 (2d ed. 1988) (Tribe). Since neither the fourteenth nor the fifteenth amendment can invalidate an innocently-motivated apportionment scheme, *see City of Mobile v. Bolden,* 446 U.S. 55, 62, 66, 100 S.Ct. 1490, 1497, 1499, 64 L.Ed.2d 47 (1980) (opinion of Stewart, J., joined by Burger, C.J., and Powell and Rehnquist, JJ.) (setting forth intent requirement); *id.* at 94, 100 S.Ct. at 1513 (White, J., concurring) (explicitly adopting intent standard); *id.* at 80, 100 S.Ct. at 1506 (Blackmun, J., concurring) (assuming intent standard), we easily find and conclude that the plan submitted by Judge Lacey does not violate the fourteenth or fifteenth amendments.

### b. *Voting Rights Act.*

Congress responded to the Supreme Court's *Bolden* opinion by amending § 2 of the Voting Rights Act to restore the "effects" standard used by many lower courts prior to 1980. *See* S.Rep. No. 97–417, at 36 (1982), 1975 U.S.C.C.A.N. at 214; Tribe § 13–8, at 1079. The amendment made clear that a violation of the Voting Rights Act could be shown by proving discriminatory effect alone, and adopted as the appropriate legal standard the test enunciated by the Supreme Court in *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) and *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). It is against this backdrop that the major objections to the Special Master's plan fall.

At its June 3 hearing, this three-judge court asked any parties wishing to challenge the Special Master's plan to submit an expert witness affidavit containing a written offer of proof by June 5, 1992. Four affidavits were timely filed, and we are convinced that none of the affidavits proffers evidence that even if assumed to be true would be sufficient to overturn the Special Master's findings. In reviewing those findings, we address the objections raised in the offers of proof.

### i. Section 2.

 As we have noted above, to sustain a § 2 claim, a complainant must show the existence of the three *Gingles* preconditions (size and compactness, political cohesion, and majority bloc voting) before its claim can be evaluated against the "totality of the circumstances" test. Similarly, as we have noted, the typical § 2 claim is vote dilution, which occurs when a minority's population is too "fragmented" or too "packed". *See* Affidavit of Dr. Theodore S. Arrington ¶¶ 28–29, at 13. *See generally* Derfner, *Racial Discrimination and the Right to Vote*, 26 Vand.L.Rev. 523, 553 (1973) (noting possible methods of vote dilution as "submerging", "fracturing", and "packing" potential voting age majorities). We find and conclude that those groups purporting to represent the African–American and Latino voters have established their initial burden under *Gingles*.

The court received the following submissions in response to its June 3 order:

1. Affidavit of Esmeralda Simmons, counsel for the Majority Coalition for Fair Reapportionment.

2. Affidavit of Wayne C. Winborne, consultant for and member of the Majority Coalition for Fair Reapportionment.

3. Affidavit of Luther Blake, consultant for plaintiff-intervenor African American Political Action Committee.

4. Affidavit of Paul Wooten, counsel to plaintiff-intervenors Major R. Owens, Carl B. Morgan and Penelope F. Willgrodt.

In addition, Intervenors Madison Homeowners Association, *et al.*, made a request for an evidentiary hearing, but that submission contained no affidavit.

As the Special Master recognized in his response to these affidavits, the positions of the various affiants could be summarized in the following manner:

1. Districts 5, 7, and 15 in the Special Master's plan dilute the minority vote because the African–American VAP is no greater than 59% in any of those districts. (Affidavit of Wayne C. Winborne ¶¶ 4, 8).

2. Districts 10, 14, and 16 weaken Latino voting strength because the Latino VAP is no greater than 59% in any of those districts. (Affidavit of Wayne C. Winborne ¶¶ 5, 8).

3. African–American registration may be overestimated in districts 5 and 7; if it is, that feature of those districts, combined with turnout rates for African–American voters that are lower than those for white voters, jeopardizes the opportunity of African–American voters in those districts to participate in the political process and elect their candidates of choice. (Affidavit of Luther Blake ¶¶ 15–19; Affidavit of Paul Wooten ¶ 21).

4. The Special Master did not use appropriate or reasonably accurate election data to analyze the likely results of elections in the minority "control or influence" districts he proposes. (Affi-

davit of Wayne C. Winborne ¶¶ 7, 12; Affidavit of Esmeralda Simmons ¶¶ 12, 13; Affidavit of Paul Wooten ¶¶ 17–18, 20).

5. The Special Master did not conduct an appropriate analysis before drawing his proposed districts. (Affidavit of Wayne C. Winborne ¶¶ 6, 12).

6. The Special Master ignored relevant differences between African–American voters within New York City and in neighboring suburban communities. (Affidavit of Wayne C. Winborne ¶¶ 9, 10; Affidavit of Paul Wooten ¶¶ 19, 22).

7. The Special Master did not link clusters of Asian–American voters in New York City. (Affidavit of Wayne C. Winborne ¶ 11).

The first and second concerns, *i.e.*, the claimed dilutions of African–American and Latino voting strength through the use of an insufficient VAP, are meritless. Some litigants have contended that a 65% minority population and a 60% VAP are required to provide a reasonable opportunity to exercise political control over that district. *See, e.g., United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977). However, as Professor Arrington pointed out, because minority communities today may be better organized and minority citizens more likely to register and vote, "it is not always necessary to have a 60 percent African–American VAP district to assure African–Americans the opportunity to elect candidates of their choice." Affidavit of Dr. Theodore S. Arrington ¶ 31, at 14 (citing Brace, Grofman, Handley and Niemi, *Minority Voting Equality: The 65 Percent Rule in Theory and Practice*, 10 Law & Pol'y 43 (1988)). The Special Master agreed with this conclusion and drew his plan accordingly.

The Special Master's plan created four African–American districts (CDs 5, 7, 8, and 15) and three Latino districts (CDs 10, 14, and 16). All seven have over a 55% VAP of the relevant minority. Affidavit of Dr. Theodore S. Arrington ¶ 40, at 19. The VAP of each of those districts is as follows:

| District | % Afr–Amer | % Hispanic | % White |
|---|---|---|---|
| CD 7 | 57.90 | 13.53 (8.73) | 24.65 |
| CD 15 | 57.27 | 18.95 (16.7) | 21.48 |
| CD 8 | 56.17 | 10.61 (7.61) | 29.51 |
| CD 5 | 55.13 | 8.92 (3.69) | 33.75 |
| CD 14 | 22.3 | 59.3 (37.22) | 14.46 |
| CD 16 | 22.58 | 58.25 (45.04) | 13.11 |
| CD 10 | 17.71 | 55.47 (42.4) | 18.59 |

The figures in parentheses represent an estimated percentage of registered Democrats who are Hispanic. *See* Exhibit 2 to Affidavit of Dr. Theodore S. Arrington.

Significantly, none of the affidavits submitted to this court indicate that a certain minimum VAP is necessary for effective minority districts in the New York City metropolitan area. On the contrary, courts have approved minority districts with VAPs of 33.6%, *see Wilson v. Eu*, 823 P.2d at 594; 40.3%, *see id.*; 42.7%, *see id.*; 51%, *see Solomon v. Liberty Cty., Fla.*, 899 F.2d 1012, 1018 (11th Cir.1990) (*in banc*), *cert.* *denied*, —— U.S. ——, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991); 51.8%, *see McGhee v. Granville County*, 860 F.2d 110, 113 (4th Cir.1988); and 55.4%, *see McDaniels v. Mehfoud*, 702 F.Supp. 588, 592 (E.D.Va. 1988). What this proves is that there is no bright-line rule for discerning an appropriate VAP level within a district that passes Voting Rights Act muster.

This case-by-case approach is underscored by the realities that every redistricting case is unique, that the line between "packing" minorities and "fragmenting" them is frequently a thin one, and that

each redistricting effort requires an extremely fact-intensive evaluation. The law, of course, does not require a statistical certainty of electing a minority candidate; it only requires a significant opportunity to do so. Based on Dr. Arrington's data (which is recapitulated in his affidavit), the Special Master concluded that the above minority control districts would walk the fine line between "packing" and "fragmenting" the minority citizens of the multicultural New York City area. In view of the fact that none of the objectors has offered proof of a more appropriate standard, we adopt the findings of the Special Master in this regard.

■ Dr. Luther Blake advances the possibility that the presence of significant numbers of noncitizen African–American populations in CDs 5 and 7 of the Special Master's plan have led to an overstatement of the African–American VAPs in those districts. However, the Special Master relied on actual votes cast (rollon) in prior elections (*e.g.*, those in which African–Americans Jesse Jackson and David Dinkins were running for President and New York Mayor, respectively) to conduct his analysis of the likely voting behavior of his districts. This statistical method would not include noncitizens (and, thus, nonvoters); therefore, the conclusions in the Blake affidavit—even if proven by admissible evidence—would not show the Special Master's conclusions to be erroneous.

■ Wayne C. Winborne suggests, via affidavit, that "obvious socio-economic differences" between African–Americans in New York City and Westchester County make the linkage of populations in CD 15 of the Special Master's plan undesirable. This broad generalization is by no means "obvious"; in fact, the Concerned Minority Citizens of Westchester requested that the Special Master "maximize minority voting potential in Westchester County" by creating an influence district "which joins the African–American and Hispanic communities throughout Westchester County with the Kingsbridge and Wakefield sections of No. Bronx," indicating that at least one group does not see the socio-economic differences as so "obvious". As the Special Master noted:

Based on all the information before him, the Special Master concluded that the African–American population in New York County is simply not large enough to create a majority African–American district in that borough without submerging the Hispanic voting age population there. He chose to reject the argument that African–Americans in Westchester County can elect candidates of choice by choosing Non–Hispanic White Democrats over Non–Hispanic White Republicans. He chose, instead, to add a significant concentration of Africa[n]–Americans in Westchester County to a majority-minority district and, simultaneously, to draw two Hispanic districts in Northern Manhattan and the Bronx.

These conclusions represent a commendable judgment to follow the intent of the Voting Rights Act by achieving at least one additional Hispanic district without reducing the number of African–American districts.

■ Finally, we must address the contention that the Special Master's plan does not treat Asian–American voters fairly or appropriately. The Asian–American population of New York City is insufficient to create a "control" district for these voters. Affidavit of Dr. Theodore S. Arrington ¶ 125, at 50. Although, as the Special Master noted, "it is theoretically possible to draw a district linking concentrations of Asian–Americans from three boroughs, the Special Master relied on testimony and anecdotal evidence gathered by him to conclude that residents of Chinatown did not wish to be joined in a district with other Asian–American voters in other boroughs." The Winborne affidavit contains nothing that, if proven, would show the facts underlying the Special Master's choice to keep Chinatown in a district lying largely in Manhattan to be erroneous.

In sum, we note that the objections to the Special Master's plan are more in the nature of political lobbying than in the nature of legal argument. Moreover, they present no significant evidentiary conflicts.

No redistricting plan, no matter who holds the pen, will be without objection. This is why, as the Supreme Court has stressed, the question of where to put the pen is first and foremost a question reserved for state government to answer. But the constitution and the Voting Rights Act, if they are to mean anything, must mean that when state government fails to take up the pen in time to permit all would-be candidates to mount effective campaigns, then the burden falls upon the judiciary to do what is necessary to preserve the elective franchise. Ten years ago, legislative delay required a federal court's intervention to protect the people of the State of New York, *see Flateau v. Anderson*, 537 F.Supp. 257 (S.D.N.Y.1982) *(per curiam)*, *appeal dismissed*, 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982), and the same has happened this decade. We can only hope that the census of 2000 will not give birth to yet another judicial redistricting drama in 2002.

### ii. Section 5.

■■■■ As the United States District Court for the District of Columbia has recently noted, in a declaratory judgment action for preclearance (which may be brought only in that court, *see* 42 U.S.C. § 1973c), a submitting jurisdiction has the burden of proving (A) that the redistricting plan does not lead to a retrogression in the position of racial minorities, and (B) that the plan is free from a discriminatory purpose. Even if a change is "ameliorative", it may violate § 5 if it discriminates on the basis of color in violation of the constitution. *State of Texas v. United States*, 785 F.Supp. at 203–04. The Special Master's plan easily avoids these problems.

■■■■ The Special Master's plan does not lead to a "retrogression" in the position of racial minorities; on the contrary, it substantially furthers the elective franchise of African–Americans and Latinos by creating more "control" districts for each than was previously present. Especially in view of the fact that New York *lost* congressional seats due to the 1990 census, the Special Master's efforts to draw *more* districts for these minority groups is commendable. Moreover, each of those districts was

drawn to encompass a VAP, at least 55%, which would give those minorities a reasonable opportunity to exercise political control over that district. In short, no serious argument can be made that the Special Master's plan leads to a retrogression in minority enfranchisement.

Similarly, as we have "easily" concluded above, the Special Master's plan is free of any discriminatory animus. No allegation of that sort is made, and in any event, no evidence is present, that any discriminatory animus motivated the Special Master's plan. On the contrary, the Special Master, who served 16 years as an outstanding federal district judge and who has since performed extensive and courageous tasks for the federal courts, presents an apolitical record of exceptional ability, absolute integrity, and unquestionable impartiality. We thus find and conclude that the Special Master's redistricting plan satisfies the requirements of § 5 of the Voting Rights Act.

### B. *Permissive criteria.*

The permissive criteria cited in the caselaw are just that—permissive. In no way is any of them required by the Voting Rights Act. This court has heard objections to the Special Master's plan from a number of groups and individuals, who variously allege that this county or town should be placed in a district with that county or town, or that a particular municipal subdivision should not be split between two districts, or that the lines drawn by the Special Master do not adequately reflect particular communities of interest. As the Special Master noted, "[t]o the extent that these factors did not impair my ability to comply with constitutional and Voting Rights Act requirements, they were considered and honored in drafting the Special Master's plan." The "permissive" criteria are designed to guide legislative discretion, but since the legislature abdicated its responsibility to draw the initial plan, that same discretion in line-drawing must be transferred to the judiciary. We are satisfied that the Special Master took evidence on, and considered, these "permissive" cri-

teria, and that he incorporated these considerations into his plan as best as possible without running afoul of the constitutional and statutory mandates. The facts that some choices had to be made and that each choice necessarily disappointed some group are simply inevitable consequences of the redistricting process.

## IV. REQUIREMENTS OF PRECLEARANCE AND TIMING

■ It is well established that a court-drawn legislative redistricting plan is not subject to preclearance by the United States Department of Justice. *Connor v. Johnson*, 402 U.S. at 691, 91 S.Ct. at 1761. Only "legislative" plans are subject to preclearance. *McDaniel v. Sanchez*, 452 U.S. 130, 137, 101 S.Ct. 2224, 2229, 68 L.Ed.2d 724 (1981). "The essential characteristic of a legislative plan is the exercise of legislative judgment [, *i.e.,*] a proposal reflecting the policy choices of the elected representatives of the people". *Id.* at 152–53, 101 S.Ct. at 2237–38. *See also* 28 C.F.R. § 51.-18(a) (1991) (changes ordered by a federal court subject to preclearance only where "they reflect the policy choices of the" jurisdiction). *Cf. Wesch v. Hunt*, 785 F.Supp. 1491, 1499–1500 (S.D.Ala.1992) (where court adopted plan proposed by plaintiff, court concluded that "there is no requirement that the plan which we now adopt be precleared before it becomes operative."), *aff'd,* —— U.S. ——, 112 S.Ct. 1926, 118 L.Ed.2d 535 (1992).

We find and conclude that the Special Master's plan, which we have approved, does not reflect the "exercise of legislative judgment". *Wise v. Lipscomb*, 437 U.S. 535, 548, 98 S.Ct. 2493, 2501, 57 L.Ed.2d 411 (1978) (Powell, J., concurring). Indeed, we could draw this conclusion almost *a fortiori* from the legislature's vehement dislike for Judge Lacey's plan, expressed through their virtually-immediate adoption of the plan drawn by the state court referees. However, we base our conclusion on a comparison of the Special Master's plan to those legislative proposals which this three-judge court received during the processes leading up to the Special Master's appointment and which were considered and rejected by the Special Master himself. We thus agree with *amicus curiae* the United States of America that a district court should make a factual determination as to whether the plan "reflect[s] the policy choices of the [state]." Memorandum for the United States as Amicus Curiae at 4 (May 11, 1992) (quoting 28 C.F.R. § 51.18(a)). Having concluded as a matter of fact that the Special Master's plan does not reflect the policy choices of New York's legislators, we conclude as a matter of law that preclearance of the Special Master's plan by the Department of Justice is not required. In any event, as we have noted, *supra*, the Special Master's plan, as drawn, comports with the same § 5 standards the Department of Justice would use in preclearing a legislative plan.

## V. THE STATE PLAN

Virtually from its inception, this three-judge court has been inundated with requests to defer to New York's legislative and judicial bodies. Indeed, the primary relief sought by the plaintiffs in *PRLDEF v. Gantt* was to order the legislature to act. At our second hearing, for instance, the court made the following statement:

We have not abandoned hope that the preferred solution to this problem can be reached, and that is by the proper action of the state legislature and the governor. They have not acted yet. It is not for us to tell them to act. I can only say what we will do if they fail to act. So if we have not been informed by a week from today that a plan has been adopted through the normal channels, we will appoint either a court-appointed expert or special master. The instructions that we will give to that person will be to draw a reapportionment plan for us.

Transcript of hearing at 8, *PRLDEF v. Gantt*, 796 F.Supp. 677 (E.D.N.Y.1992). Although we have declined to abstain, and enjoined the parties in the state court proceeding, *see PRLDEF v. Gantt*, 796 F.Supp. 677, 680–81 (E.D.N.Y.1992), that injunction was stayed by the United States Supreme Court pending disposition of the

state court plaintiffs' appeal in that Court, which is set for argument this October.

Thus, the state court continued in developing its plan, which was released only days after the Special Master's plan was released. The state legislators, who until then had not been able to agree upon a plan which satisfied both sides of the political aisle, promptly embraced the state court's plan as their own and enacted it. We are advised that that plan is currently undergoing the preclearance process before the Civil Rights Division of the United States Department of Justice in Washington, DC; however, until a legislative plan is actually precleared, it has no legal effect.

Because of this, we have approved the Special Master's plan and stand ready to implement it should a valid legislatively-adopted reapportionment plan not be in place by 5:00 pm on July 8, 1992.

## VI. CONCLUSION

We are dealing here with an exquisite blend of fundamental constitutional and statutory problems on one hand, and extremely practical timing considerations on the other. A fair election process requires adequate time for candidates to make themselves and their positions known to their constituents. A bare four months remains before election day. Well before that time, the primary nomination process must be completed. By an amendment to the Election Law, New York's legislature and Governor have already postponed the commencement of this process by one month. We are, of course, inclined to defer to the state's judgment as to how much time is fair and proper to run the electoral system, so we have assumed that the process must begin on July 9. However, in order to begin, there must be a valid plan in effect. At this point the only valid plan is the Special Master's. The plan initially adopted by the state court and passed by the legislature will not be valid until precleared. 42 U.S.C. § 1973c.

Theoretically, the date for commencement of the process could be postponed still further. Each postponement, however, tends to favor incumbents and organized political parties over challengers and minority groups. As a result, further postponements will run counter to the objectives of both the constitution and the Voting Rights Act.

None of the submissions to this court offers to prove facts that would undermine the Special Master's ultimate conclusions. Thus, no evidentiary hearing is necessary. We therefore adopt and approve the report and redistricting plan of the Special Master filed with this court on May 26, 1992. Because of the institutional preference for a legislatively-adopted reapportionment, we do not order that the Special Master's plan take effect immediately and thereby supersede the legislative plan. There is still a possibility that the legislative plan may be precleared by the Department of Justice and thereby become law in time for candidates to begin collecting signatures on designating petitions on July 9, 1992, the deferred date set by the State of New York for commencement of that process. However, if no other valid redistricting plan is in place by 5:00 pm, Eastern Daylight Savings Time, on July 8, 1992, the Special Master's plan shall automatically take effect as the plan of congressional districts for the 1992 primary and general elections in the State of New York.

SO ORDERED.