John Robert SMITH, Shirley Hall, and Gene Walker plaintiffs

v.

Eric CLARK, Secretary of State of Mississippi; Mike Moore, Attorney General for the State of Mississippi; Ronnie Musgrove, Governor of Mississippi; Mississippi Republican Executive Committee; and Mississippi Democratic Executive Committee Defendants

Beatrice Branch; Rims Barber; L.C. Dorsey; David Rule; James Woodard; Joseph P. Hudson; and Robert Norvel Intervenors

No. CIV.A. 3:01–CV–855WS.

United States District Court, S.D. Mississippi, Jackson Division.

Feb. 19, 2002.

Arthur F. Jernigan, Jr., Watson & Jernigan, P.A., Jackson, for John Robert Smith, Shirley Hall, Gene Walker, plaintiffs.

T. Hunt Cole, Jr., Office of the Attorney General, Michael B. Wallace, Phelps Dunbar, John G. Jones, Jones & Funderburg, Herbert Lee, Jr., Lee & Associates, Robert B. McDuff, Robert B. McDuff, Attorney, Jackson, for Eric Clark, Secretary of State of Mississippi, Mike Moore, Attorney General for the State of Mississippi, Ronnie Musgrove, Governor of Mississippi, the Mississippi Republican Party Executive Committee, Mississippi Democratic Party Executive Committee, defendants.

E. GRADY JOLLY, United States Circuit Judge, HENRY T. WINGATE, United States District Judge and DAVID C. BRAMLETTE, United States District Judge.

## OPINION

E. GRADY JOLLY, Circuit Judge.

This opinion follows the trial in this matter on January 28 and 29, 2002, and our order of February 4, 2002, which attached the proposed congressional redistricting plan that we had drafted. We stated in that order that we proposed to implement that plan, absent timely preclearance by the Department of Justice of the plan adopted by the Hinds County Chancery Court. We directed the parties to show cause why this court's plan failed to meet constitutional and federal standards and should not be implemented. The Intervenors filed certain objections. For the reasons that follow, we overrule the Intervenors' objections to this court's plan. Furthermore, we make clear that we will enjoin the implementation of the Chancery Court plan for the 2002 congressional elections, and order that the elections in 2002 be conducted in accordance with this court's plan of February 4, 2002, if the Chancery Court plan has not been precleared on or before the close of business on February 25, 2002.[1]

I

*Facts and Procedural History*

The facts and procedural history are set out in our order of January 15, 2002. In that order, we concluded that it was necessary for us to assert our jurisdiction in order to ensure that an enforceable congressional redistricting plan was in place prior to the March 1, 2002 deadline for candidates to qualify for the 2002 congressional elections, because it appeared uncertain whether the State authorities would have a redistricting plan in place prior to that deadline.

On January 16, we conducted a scheduling conference. Thereafter, we entered a scheduling order allowing the parties an opportunity to conduct discovery and setting the matter for trial on January 28 and 29, 2002. Counsel for the Mississippi Democratic Executive Committee advised this court that his client adopted the position taken by the Intervenors. The Mississippi Republican Executive Committee was aligned with the Plaintiffs.

At trial, the Plaintiffs presented nine plans and called seven witnesses. The Intervenors presented two plans and called three witnesses. In addition, the record of the proceedings conducted in the Chancery Court, including the trial transcript and exhibits, was made a part of the record in this federal proceeding.

The Intervenors submitted a post-trial brief in which they contended that, even if the plan adopted by the Chancery Court is not precleared prior to the March 1 qualifying deadline, we nevertheless must defer to state policy and use the state court plan as a temporary plan for the 2002 congressional elections. Alternatively, the Intervenors urged us to utilize Branch Plan 2B, described *infra,* as an interim court-ordered plan. In the further alternative, the Intervenors urged us to postpone the qualifying deadline to await a preclearance decision. Finally, the Intervenors argued that, if this court drew its own plan, it should attempt to draw the third district with a higher percentage of black voting

---

1. The plan adopted by the Chancery Court cannot be implemented unless the Department of Justice "has interposed no objection within a 60–day period following submission." 28 C.F.R. § 51.1(2). The initial 60–day period was to have expired on February 25. On February 14, the Department of Justice requested additional information from State authorities. A new 60–day period will begin to run upon receipt of the requested information. 28 C.F.R. § 51.37. It is still possible that the Chancery Court plan will be precleared by February 25.

age population than that reflected in the plans submitted by the Plaintiffs.

After considering these arguments of counsel and the evidence presented at trial, we drafted our own plan. We concluded that none of the plans submitted by the parties fully comported with the objectives and criteria that should be incorporated in a judicially approved redistricting plan. We considered that the Intervenors had offered little evidence that their plans address any of the factors that must be considered by a federal court in congressional redistricting. In reviewing the plans offered by the Intervenors, we took into account that they were admittedly drawn with partisan political objectives in mind, and, as a result, compactness of districts was not a factor. With respect to the plans offered by the Plaintiffs, although the testimony indicated that they had taken into account some of the relevant neutral factors, we found that each of them had various flaws. We concluded that the process would be shortened and simplified by drafting and perfecting our own plan, and that is what we did.

On February 4, we entered an order attaching our plan. Our order stated that we proposed to implement that plan absent the timely preclearance of the state court plan. We directed the parties to show cause by written objections, why this court's redistricting plan, if implemented, would not satisfy all state and federal statutory and constitutional requirements; and to make any other critical comments and suggestions with respect to the plan that the parties deemed appropriate.

On February 14, the Department of Justice requested additional information from State authorities, and advised that a new 60–day period would begin to run upon receipt of the requested information.

We now address the parties' objections and comments regarding our plan, and further explain the factors we considered, and how we applied them, in drafting our plan.

## II

### Objections and Comments of the Parties

#### A

##### Plaintiffs' Comments

The Plaintiffs and the Mississippi Republican Executive Committee had no objections as such to our plan. They did, however, comment on our analysis of the plan, requesting an explanation of the legal significance of our decision to consider, as a secondary factor, the effort to include as much as possible of former districts 3 and 4 in the new District 3. We have done so in the analysis of the factors we considered, and how we applied them, *infra.*

The Plaintiffs and the Mississippi Republican Executive Committee also commented that our February 4 order did not explain what we meant by "the timely preclearance of the redistricting plan adopted by the State Chancery Court."

The Plaintiffs also assert that the plans they submitted satisfy all constitutional and statutory criteria and can be defended on neutral redistricting principles. The Plaintiffs presented four basic plans, as well as modified versions of each of them. After studying each of the Plaintiffs' plans and after considering all neutral criteria for drafting congressional redistricting plans, we found various flaws in each, including: the fragmentation of communities of interest, especially the community of interest represented by southwest Mississippi; compactness concerns; retrogression concerns; unnecessary outdistricting of one of the incumbents; unnecessary division of municipalities outside the City of Jackson; and unnecessary splits in voting precincts.

We now turn to address the objections of the Intervenors.

## B

### *Intervenors' Objections and Comments*

The Intervenors object to our plan on many grounds, most of which were raised prior to trial and in their post-trial brief. We will address each of those objections separately, in the order in which they were presented to us.

### 1

### *Adoption of Chancery Court Plan*

■ The Intervenors contend that the plan adopted by the Chancery Court reflects state policy, and that we should defer to that plan. They make this argument even though the Chancery Court plan is not effective as law because it has not been precleared. In support, the Intervenors rely on *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *Terrazas v. Clements,* 537 F.Supp. 514 (N.D.Tex.1982); *Burton v. Hobbie,* 543 F.Supp. 235 (M.D.Ala.), *aff'd,* 459 U.S. 961, 103 S.Ct. 286, 74 L.Ed.2d 272 (1982); and *Burton v. Hobbie,* 561 F.Supp. 1029, 1034 (M.D.Ala.1983). In *Upham,* the Supreme Court stated:

> [W]henever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor intrude upon state policy any more than necessary.

*Id.* at 41–42, 102 S.Ct. 1518 (internal quotation marks and citation omitted); *see also White v. Weiser,* 412 U.S. 783, 797, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973) (the only limits on judicial deference to state apportionment policy are the substantive constitutional and statutory standards to which

such state plans are subject). At issue in *Upham* was a congressional redistricting plan that had been enacted by a state legislature. Although the United States Attorney General had objected to only part of that plan, the three-judge federal court disregarded not only the part of the plan to which the Attorney General had objected, but also parts of the plan to which no objection had been lodged. The Supreme Court held that a district court has no authority to disregard those portions of a state plan which have been approved by the Attorney General under § 5 of the Voting Rights Act. *Id.* at 43, 102 S.Ct. 1518.

*Terrazas* addressed legislative redistricting plans for the Texas Senate and House of Representatives that had been adopted by the Texas Legislative Redistricting Board. The plans had been submitted to the United States Department of Justice, which had objected to parts of the plans and had approved the remaining parts. Under those circumstances, the court deferred to the state plan, except as to the portions of it that were objected to by the Department of Justice. *Id.* at 528. Similarly, a legislative plan was at issue in the *Burton* decisions. Under those circumstances, and consistent with *Upham, White,* and *Terrazas,* the Alabama district court ordered the implementation of the legislature's plan, with modification to one of the counties. 543 F.Supp. at 238–39.

The principle announced in *Upham* and *White,* and applied in *Terrazas* and *Burton,* does not apply in this case. This is true because, as of this date, no part of the plan adopted by the Chancery Court has been approved by the Attorney General. We think that, for purposes of deference, it is important to note that the plan adopted by the Chancery Court was drafted by the Intervenors (plaintiffs in Chancery Court), not by the Chancery Court, and not by the Mississippi Legislature, which failed to enact a congressional redistricting plan. Ac-

cordingly, there is no expression, certainly no clear expression, of state policy on congressional redistricting to which we must defer. *See Carstens v. Lamm,* 543 F.Supp. 68, 78 (D.Colo.1982) (where plan had been enacted by state legislature, but vetoed by governor, who submitted his own plan, court regarded those plans as "proffered current policy" rather· than clear expressions of state policy); *Shayer v. Kirkpatrick,* 541 F.Supp. 922, 929 (W.D.Mo.) (plan not adopted by state legislature "can hardly be said to demonstrate any legislative intent other than a rejection of the plan"), *aff'd,* 456 U.S. 966, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982).

▪ Furthermore, as of the date of this opinion, the Chancery Court's plan has not been precleared, in whole or in part. In *United States v. Board of Supervisors of Warren County, Miss.,* 429 U.S. 642, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977), the Supreme Court held that a three-judge court erred by adopting a plan that had not been precleared, because it exceeded the scope of its jurisdiction under § 5 of the Voting Rights Act. A three-judge court does not have jurisdiction to determine whether a covered change does or does not have the purpose or effect "of denying or abridging the right to vote on account of race or color." *See id.* at 645, 97 S.Ct. 833 (quoting *Perkins v. Matthews,* 400 U.S. 379, 385, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971)).[2]

Because any state plan implemented for the 2002 elections must comply with § 5, it would appear that ordering implementation of the unprecleared state court plan would require us to make, at least implicitly, the forbidden determination that the plan (and the Mississippi Supreme Court order, as well), comply with § 5. In their post-trial brief, the Intervenors argue that the plan adopted by the Chancery Court "does not retrogress and therefore complies with the substantive standards of Section 5, . . . does not dilute minority voting strength, and . . . is constitutional." As we have said, the Supreme Court has made it clear that we do not have jurisdiction to make such a determination.

▪ Under § 5, our inquiry "is limited to the determination whether a voting requirement is covered by § 5, but has not been subjected to the required federal scrutiny." *Board of Supervisors,* 429 U.S. at 645–46, 97 S.Ct. 833 (internal quotation marks and citations omitted). We do not think that it can be seriously contested that the changes in state election law represented by the Mississippi Supreme Court's December 13 order granting jurisdiction to the Chancery Court, as well as in the redistricting plan adopted by the Chancery Court, are covered by § 5, and that they have not been precleared as of this date.[3] Thus, until the state court plan has been precleared, we cannot defer to it.

---

**2.** On the other hand, the Supreme Court has directed that federal courts, in fashioning congressional redistricting plans, should follow appropriate § 5 standards. *See Abrams v. Johnson,* 521 U.S. 74, 96, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); *McDaniel v. Sanchez,* 452 U.S. 130, 149, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981).

**3.** In a submission filed on February 15, following the Department of Justice's request for additional information from State authorities, the Intervenors argue that, if the 60–day deadline expires on February 25 without an objection by the Department of Justice, the

Chancery Court plan will be precleared automatically. Although the Department of Justice has not sought additional information about the redistricting plan adopted by the Chancery Court, the letter from the Department to the Mississippi Attorney General makes clear that the Department cannot make a determination concerning the Chancery Court plan until it receives the requested information and makes a decision on whether to approve the assignment of jurisdiction to the Chancery Court. The letter states:

Because the December 13, 2001, Order of the Mississippi Supreme Court . . . and the

## 2
### *Branch Plan 2B*

Alternatively, the Intervenors urge us to order implementation of Branch Plan 2B, a slightly modified version of the Chancery Court plan, which reduces by two the number of split counties. They argue that our adoption of Branch Plan 2B would allow implementation of the state policies reflected in the Chancery Court plan without actually ordering that unprecleared plan into effect in its entirety.

We do not think this is the thing to do. At the trial before us, the Intervenors introduced no evidence that the neutral factors applicable to federal court-ordered redistricting plans were considered in drafting either the plan adopted by the Chancery Court or Branch Plan 2B. Furthermore, based on the evidence presented in the Chancery Court and in the Intervenors' arguments to this court, it seems indisputable that political competitiveness played a major, if not controlling, role in determining how the districts were drawn in each of the plans. Finally, it is evident that compactness was not considered in drafting the plans submitted by the Intervenors. The absence of compactness is most evident in District 1, which includes a group of counties from the Tennessee line in the northernmost part of the State, joined only by a narrow corridor to the southern part of central Mississippi to include Rankin, Madison, and Scott Counties. It is essentially uncontested that political considerations are the only reasons for disregarding historical regional interests. For these reasons, we cannot accept the Branch 2B plan.

## 3
### *Postponement of Qualifying Deadline*

■ The Intervenors argue, alternatively, that, if we do not utilize the plan adopted by the Chancery Court or Branch Plan 2B, we should postpone the qualifying deadline to await a preclearance decision. The Intervenors essentially are asking that we defer to the state policies reflected in the unprecleared plan adopted by the Hinds County Chancery Court, when, at the same time, we would have to cast aside the state policy adopted by the Mississippi Legislature when it enacted the statute setting the qualifying deadline.

As we explained in our order of January 15, we are convinced that a postponement of that deadline would likely create confusion, misapprehension and burdens for the voters, for the political parties, and for the candidates. As we said in our order, many voters want to participate in the election process to a greater extent than mere voting. They want to know the candidates personally, to select their choice, to give

---

December 21 & 31, 2001 Orders of the Chancery Court which adopted a redistricting plan, are directly related, it would be inappropriate for the Attorney General to make a determination concerning the congressional redistricting plan adopted by the Chancery Court.

The Intervenors argue, however, that a new 60–day period is not triggered because the information requested by the Department of Justice is unnecessary and irrelevant. We cannot agree. We think that the information requested by the Department of Justice is material and relevant in order for the Department of Justice to understand fully the extent and consequences of a chancery court adopt-

ing a United States congressional redistricting plan for the entire state when it has never been done before and when the Mississippi Supreme Court's declaration of jurisdiction seems to constitute a change in both case and statutory law. If this newly asserted change in redistricting authority is not precleared, it renders the plan itself a legal nullity under the Voting Rights Act. Thus, the Department of Justice's decision to investigate the change in state law that authorized the Chancery Court to adopt a redistricting plan, before considering the plan itself, does not constitute "unwarranted administrative conduct." *See Georgia v. United States*, 411 U.S. 526, 541 n. 13, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973).

money to their selection, and to organize the people in their precincts or counties in the campaign for their choice. Given that all previous districts are being cross-mixed by the loss of one congressional representative, resolving these new problems will take all the pre-primary time that the present statute allows. If we delay the establishment of election districts and advance qualifying dates, such voters who want to become fully involved in the process will not timely know in which district they are going to be placed, and thus will not timely know where and with whom to become involved. The same situation will exist for the candidates. Postponing the election schedule means that the candidates and political parties would encounter campaign and election burdens—that is, significant time constraints on getting acquainted with new voters, establishing organizations in new election districts and the multiple new precincts and counties therein, raising campaign funds within the new districts, developing strategies for particular geographic areas, etc.

Indeed, postponing the election schedule is inconsistent with the position taken in the Mississippi Attorney General's preclearance submission, which requests expedited consideration in order to allow candidates and voters fully to understand the newly enacted district lines prior to the March 1 qualifying deadline. Furthermore, changing the March 1 deadline is inconsistent with the position taken by the Intervenors in their amended complaint filed in Chancery Court, in which they assert that, if a plan is not adopted in time for it to be implemented in advance of the March 1 deadline, "the interests of the

plaintiffs and all Mississippi voters in enforcement of Mississippi's election laws will be compromised, and their rights under Mississippi law to participate in a congressional election process conducted in a timely manner will be violated." We also consider it significant that changing the deadline would contravene the Mississippi Supreme Court's recognition of the importance of such deadlines under state election law. *See Adams County Election Comm'n v. Sanders*, 586 So.2d 829, 832 (Miss.1991) (an election schedule that violates the state election code is adverse to the public interest).

In sum, we find that postponement of the qualifying deadline would be damaging to the rights of the voters, the candidates and the political parties, and would contravene established state policy that should be respected. We therefore decline to order postponement of the deadline in order to await a preclearance decision,[4] especially when we have no way of determining if and when preclearance will occur.

### 4
### *Black Voting Strength in District 3*

■ The Intervenors object to this court's plan on the ground that it limits black voting strength in District 3. They raised this issue for the first time in their post-trial brief, in which they argued that we should attempt to draw District 3 with a higher percentage of black voting age population than that reflected in the plans submitted by the Plaintiffs. They note that, under the former five-district plan, the percentage of black voting age population in former district 4 is 42.94%, and in former district 3, 29.45%. Under this

---

4. On February 14, the Department of Justice requested additional information from State authorities, and indicated that a new 60–day period would begin to run upon the receipt of that information. It is, of course, possible that the Department of Justice can still act before the March 1 candidate qualification deadline. On the other hand, it is not implausible that the Department of Justice may take the full 60 days before making its decision. In any event, we decline to upset the established schedule for the election process which begins on March 1.

court's plan, the percentage of black voting age population in District 3 is 30.37%. The Intervenors complain that our plan dismantles the black population in former district 4, sending nearly 50% of it to District 2, and retaining only 42.5% of it in District 3, while in the plan adopted by the Chancery Court, only 38.6% of the black population in former district 4 went to the new district 2, and 52.7% of it stayed in the new district 3.

In drafting our plan, we considered race only to the extent that we are allowed to consider it in a redistricting case: The Voting Rights Act required that we draw District 2 with an appropriate percentage of black voting age population in order to assure minority voters a reasonable opportunity to elect their representative of choice. The Intervenors do not argue that our plan results in minority vote dilution in violation of § 2 of the Voting Rights Act. Nor do they claim that the Voting Rights Act requires the creation of a so-called "minority influence" district. *See Rural West Tennessee African–American Affairs Council, Inc. v. McWherter*, 877 F.Supp. 1096, 1101 (W.D.Tenn.) (defining an influence district as one in which the population "includes sufficient members of a minority group to influence substantially an election, but not enough to comprise a majority or super-majority as is necessary for a majority-minority district", and stating that such "an influence district exists when members of a minority group compose 25% or more of the voting-age population of a district", and "may also exist when a minority group consists of less than 25% of the voting-age population of a district"), *aff'd*, 516 U.S. 801, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995).

The Supreme Court has stated that "federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law." *Voinovich v. Quilter*, 507 U.S. 146, 156,

113 S.Ct. 1149, 122 L.Ed.2d 500 (1993); *see also Balderas v. Texas*, Civ. Action No. 6:01CV158, at 14 (E.D.Tex.2001) (unpublished) ("We have no warrant to impose our vision of 'proper' restraints upon the political process beyond the constraints imposed by the Constitution or the Voting Rights Act."). The Intervenors cite no authority that would support our consideration of race beyond the extent required by §§ 2 and 5 of the Voting Rights Act. Consequently, we cannot accept the Intervenors' assertion that race should be a factor in drawing the lines for District 3. Even if we assume that the Supreme Court would hold in this case for the first time that the Voting Rights Act requires the creation of a minority "influence" district, the Intervenors have forfeited that claim by failing to raise it; furthermore, they have presented no evidence that would support the claim. To the extent that they are arguing that more minorities are required in District 3 to make the congressional race competitive for democratic candidates, political considerations are inappropriate for a federal court to consider when drafting a congressional redistricting plan. *See Balderas*, at 10 ("political gerrymandering, a purely partisan exercise, is inappropriate for a federal court drawing a congressional redistricting map"). Moreover, because a democratic congressman has been elected and re-elected in former district 5, in which the percentage of black voting age population (18.67% based on 2000 Census figures) is substantially lower than in District 3 in our plan, we are reluctant to accept the Intervenors' implicit assertion that a democratic candidate cannot be competitive in a district in which the percentage of black voting age population is only 30%.

In any event, as a practical matter, we find that it is not possible for us to increase the percentage of black voting age population in District 3 without splitting counties and precincts unnecessarily, with-

out sacrificing compactness, and without transgressing the requirements of the Voting Rights Act. It is certain that significant retrogression would result in District 2 if black voting age population is shifted from District 2 to increase the percentage of black voting age population in District 3. There are no large concentrations of black voting age population near the borders of Districts 1 and 4 that can be shifted to District 3 so as to increase substantially the percentage of black voting population in District 3. Indeed, the *only* way to increase the percentage of black voting age population in District 3 to the level in the plans submitted by the Intervenors is to remove Rankin County and southern Madison County from District 3, as was done in the plans submitted by the Intervenors. Under any plan of reasonable compactness, Rankin County and southern Madison County cannot be placed in District 2 without causing significant retrogression—that is, significantly lowering the percentage of black voting age population in District 2, which would be violative of § 5 of the Voting Rights Act. Rankin County and southern Madison County cannot be placed in District 4, because they are not adjacent to the border of District 4. They can be placed in District 1 only if a narrow corridor is created to join them with the northernmost counties in the State that reaches to the Tennessee line. To do so would not only violate the compactness principle, but it would also disregard historical regional interests and result in the placement of several large growth areas in a single district.

We thus overrule the Intervenors' objections, and turn now to explain the plan the court adopted in its February 4 order.

## III

### *Court's Plan*

The standards applicable to court-ordered congressional redistricting plans are fairly well-established: Courts must satisfy constitutional and statutory criteria and, to the extent feasible, certain neutral, secondary criteria.

### A

### *Constitutional Criterion: Population Equality*

█ The Supreme Court has held that the United States Constitution requires that each congressional district in a state contain equal population. *See Wesberry v. Sanders*, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (Art. I, § 2 of the Constitution requires that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."). Moreover, the Supreme Court has been an exceedingly strict taskmaster in requiring the lower courts to balance population among districts with precision. *See Kirkpatrick v. Preisler*, 394 U.S. 526, 531, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) ("[T]he 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small."); *Karcher v. Daggett*, 462 U.S. 725, 734, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) ("there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2 without justification"). Nevertheless, the Court is "willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts," so long as it is shown "with some specificity that a particular objective required the specific deviations." *Id.* at 740–41, 103 S.Ct. 2653.

In *Abrams v. Johnson,* 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997), the Court stated that "[c]ourt-ordered districts are held to higher standards of population equality than legislative ones," but that "[s]light deviations are allowed" if supported by " 'historically significant state policy or unique features.' " *Id.* at 98, 117 S.Ct. 1925 (quoting *Chapman v. Meier,* 420 U.S. 1, 26, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975)). The court-ordered plan in *Abrams* had an overall population deviation (the difference in population between the two districts with the greatest disparity) of 0.35%, and an average population deviation (the average of all districts' deviation from perfect one-person, one-vote allocation) of 0.11%. *Id.* at 99, 117 S.Ct. 1925. The district court enumerated the following state policies and conditions as justification for the deviations: (1) Georgia's strong historical preference for not splitting counties outside the Atlanta area; and (2) maintaining core districts and communities of interest. *Id.* at 99–100, 117 S.Ct. 1925. The district court found that the small counties among Georgia's 159 counties represented communities of interest to a much greater degree than was common, and the Supreme Court agreed that "such a proliferation provides ample building blocks for acceptable voting districts without chopping any of those blocks in half." *Id.* at 100, 117 S.Ct. 1925 (internal quotation marks and citation omitted). The Court observed that, even if it had found the population deviation unacceptable, it "would require some very minor changes in the court's plan—a few shiftings of precincts—to even out the districts with the greatest deviations." *Id.*

Thus, our task in drafting the map was to make every good-faith effort to place 711,164 people in each of two districts and 711,165 people in each of the other two districts, which is based on a total population of 2,844,658, according to 2000 Census figures. *See Karcher,* 462 U.S. at 738, 103 S.Ct. 2653 ("because the census count represents the best population data available, it is the only basis for good-faith attempts to achieve population equality" (internal quotation marks and citation omitted)). Obviously, this is not an easy task when, at the same time, we are trying to prevent retrogression in District 2 and trying not to make unnecessary divisions of counties and municipalities. Nevertheless, we have been able to achieve virtual equality: Districts 3 and 4 each contain 711,164 persons. District 1 contains 711,160 persons (five too few), and District 4 contains 711,170 persons (five too many). This seems to comply fully with the Supreme Court's requirements.[5]

In sum, our plan satisfies the constitutional standard of one-person, one-vote, as enunciated by the Supreme Court. Having concluded that we have satisfied the constitutional criteria, we now turn to consider the statutory requirements.

### B

#### Statutory Criteria

The two statutes we have to consider are §§ 2 and 5 of the Voting Rights Act. *See Abrams,* 521 U.S. at 90, 117 S.Ct. 1925 ("On its face, § 2 does not apply to a court-ordered remedial redistricting plan, but we will assume courts should comply with the section when exercising their equitable powers to redistrict."); *id.* at 96, 117 S.Ct. 1925 (application of § 5 standards to a court-ordered plan "is a reasonable standard, at the very least an equitable factor to take into account, if not as a

---

5. In order to achieve absolute perfection, we would have to split precincts. We find, based on the testimony of Sue Sautermeister, that splitting precincts would cause administrative problems for election officials and confusion and frustration for voters.

statutory mandate"); *McDaniel v. Sanchez,* 452 U.S. 130, 149, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981) (although court-devised plans are not subject to preclearance requirements, "in fashioning the plan, the court should follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases").

### 1
### *Section 2 of the Voting Rights Act*

█ Section 2 of the Voting Rights Act prohibits any voting procedure that "results in a denial or abridgement of" the voting rights of a person on account of race, color, or membership in a language minority. 42 U.S.C. § 1973(a). A violation of § 2 is established by showing that "based on the totality of the circumstances," members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

As we have earlier noted in addressing their objections, the Intervenors object to our plan on the ground that it limits black voting strength in District 3, but they do not argue that our plan violates § 2. Nevertheless, as the Supreme Court has instructed federal redistricting courts to do, we have considered § 2 in drafting our plan. The minority population in Mississippi is sufficiently large and geographically compact to constitute a majority in only one of Mississippi's four congressional districts. *See Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (setting forth elements of vote dilution challenge to multimember districts); *see also Growe v. Emison,* 507 U.S. 25, 40–41, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (*Gingles* elements for vote dilution claim apply in challenges to single-member districts). Our plan creates a majority-minority district, District 2. Accordingly, we conclude that it does not result in minority vote dilution in violation of § 2. Consequently, we move on to discuss § 5.

### 2
### *Section 5 of the Voting Rights Act*

█ The requirements of § 5 focus our attention first and primarily on District 2, in order to assure that our plan does not result in significant retrogression in the position of minorities with respect to their opportunity to elect their representative of choice. *See Puerto Rican Legal Defense & Education Fund, Inc. v. Gantt,* 796 F.Supp. 681, 691 (E.D.N.Y.1992) ("a court-drawn plan should be drafted so that it will not lead to retrogression in the position of a racial or language minority group with respect to their opportunity to exercise the electoral franchise effectively").

The percentage of black voting age population in district 2 under the former five-district plan, based on 2000 Census figures, is approximately 61%. Under our plan, the percentage of black voting age population in District 2 is 59.2%. This does not constitute retrogression in the voting rights of minorities in violation of § 5.

In sum, we are thus satisfied that our plan satisfies the criteria of all applicable federal statutes. We now turn to discuss the secondary criteria that we considered in drafting our plan.

### C
### *Secondary Criteria*

In addition to the constitutional and statutory criteria, federal redistricting courts generally apply neutral factors, including compactness, contiguity, and respect for historical local political boundaries, in drafting congressional redistricting plans. *See Balderas,* at 5; *Gantt,* 796 F.Supp. at 685.

█ Based on the evidence presented to us, we applied the following secondary fac-

tors, listed in the order of priority given to each factor: (1) compactness and contiguity; (2) respect for county and municipal boundaries; (3) preservation of historical and regional interests; (4) placement of the major research universities and military bases, respectively, in separate districts; (5) placement of at least one major growth area in each district, and avoidance of placement of several major growth areas in the same district, so as to minimize population deviation among the districts as Mississippi's population changes; (6) inclusion of as much as possible of southwest Mississippi from former district 4, and east central Mississippi from former district 3, in the new District 3; (7) protection of incumbent residences; and (8) consideration of the distances of travel within each district. We now turn to explain further how we applied each of the factors we considered in drafting our plan.

### 1

#### *Compactness and Contiguity*

 "The compactness requirement specifies that the boundaries of each congressional district shall be as short as possible." *Carstens,* 543 F.Supp. at 87. The contiguity requirement "specifies that no part of one district be completely separated from any other part of the same district." *Id.* at 88 (internal quotation marks and citation omitted). These criteria "were originally designed to represent a restraint on partisan gerrymandering." *Id.* at 87; *see also Arizonans for Fair Representation v. Symington,* 828 F.Supp. 684, 688 (D.Ariz.1992) ("Districts that are geographically compact and contiguous are less likely to suffer from the ills of gerrymandering [and] assist in maintaining communities of interest"), *aff'd,* 507 U.S. 981, 113 S.Ct. 1573, 123 L.Ed.2d 142 (1993).

"In addition to serving as a check on gerrymandering, compactness 'facilitates political organization, electoral campaigning, and constituent representation.'" *Good v. Austin,* 800 F.Supp. 557, 563 (E.D. Mich.1992) (quoting *Karcher,* 462 U.S. at 756, 103 S.Ct. 2653 (Stevens, J., concurring)); *Carstens,* 543 F.Supp. at 87 ("Compact districts ... reduce electoral costs (in both time and money) and increase the opportunities for more effective representation by concentrating a congressperson's constituency in an easily accessible area."). "In a practical sense, the compactness of a congressional district will be directly affected by the density and distribution of a state's population. Since population requirements have priority, compactness must often be sacrificed in order to achieve an acceptable range of population deviation." *Id.*

This court has attempted to achieve, as nearly as possible, four compact districts. The ability to create compact districts in Mississippi is limited by the distribution of population. Much of the State is rural, with large concentrations of population in only a few areas of the State. Districts that contain many sparsely populated counties and large rural areas necessarily will be less compact than districts that contain heavily populated counties and urban areas, as a result of the population equality requirement. Furthermore, a more compact plan cannot be drawn for two additional reasons: First, it would not be possible to do so and to prevent retrogression in District 2; and secondly, it would be a barrier to including as much as possible of the former districts 3 and 4 in the new District 3.

### 2

#### *Respect for County and Municipal Boundaries*

As Justice Stevens observed in his concurring opinion in *Karcher,*

[s]ubdivision boundaries tend to remain stable over time. Residents of political units such as townships, cities, and coun-

ties often develop a community of interest, particularly when the subdivision plays an important role in the provision of governmental services. In addition, legislative districts that do not cross subdivision boundaries are administratively convenient and less likely to confuse the voters.

*Karcher*, 462 U.S. at. 758, 103 S.Ct. 2653 (Stevens, J., concurring).

■ To the extent possible, ·consistent with the constitutional and statutory requirements, federal redistricting courts attempt to preserve local political boundaries—city and county lines. *See Balderas*, at 7; *Arizonans*, 828 F.Supp. at 688 ("a state has a substantial interest in preserving city and county lines" because of "the importance of shared local experiences and the ability of groups and candidates to 'network' within their communities' "; furthermore, "[p]reserving these communities of interest also enables a congressman to represent his constituency better"); *Carstens*, 543 F.Supp. at 88 (county and municipal boundaries "should remain undivided whenever possible because the sense of community derived from established governmental units tends to foster effective representation"). "Unnecessary fragmentation of these units not only undermines the ability of constituencies to organize effectively but also … increases the likelihood of voter confusion regarding other elections based on political subdivision geographics." *Id.* (internal quotation marks and citation omitted). We turn now to address these concerns as they apply to the redistricting map that we have drawn.

We should first note that the priority given to the constitutional requirement of population equality makes the division of some counties unavoidable. *See Balderas*, at 16 ("It is an ugly fact that the law's insistence on absolute population equality in court-drawn plans has the perverse effect of splitting counties and cities, when a tolerance of greater deviation would not demand such undesirable divisions."). Our plan splits eight counties: Hinds, Jasper, Jones, Leake, Madison, Marion, Webster, and Winston. We do observe, however, that eleven counties are split under the five-district congressional redistricting plan adopted by the Mississippi Legislature in 1992.

Under the five-district plan, Jasper County is in district 3, and Marion County is in′ district 4. Our plan splits each of these counties, placing part of each in District 3 and the remainder in District 4. This was done as part of the effort to create a compact new District 4, as well as to equalize, as nearly as practicable, the population among the districts. In dividing these counties, we also took into consideration our attempt to combine as much of former districts 3 and 4 in new District 3 as is feasible, as we later explain. In making these divisions, we made every effort to respect the boundaries of municipalities. Jasper County is split in a particular way so as to avoid splitting the precincts which lie within the boundaries of the town of Bay Springs.

Hinds and Madison Counties are split as part of the effort to achieve population equality. In addition, it was necessary to split these counties so as to prevent retrogression in District 2. If we had included these areas, which have a majority white population, in District 2, that district would have had a significantly lower percentage of black voting age population. We could not have placed these portions of Hinds and Madison Counties in District 4, because it is not contiguous to them. Furthermore, we could not have placed them in District 1 without ignoring completely the compactness requirement.

We did split the City of Jackson in Hinds County. It is the only municipality

that is split. However, Mayor Johnson testified in Chancery Court that he preferred that the City be represented by two congresspersons. In addition, as we have earlier noted with respect to why Hinds County was split, it was also necessary to split the City of Jackson to prevent retrogression in District 2.

Leake County is also split as part of the effort to prevent retrogression in District 2, and to help achieve population equality among the districts. The irregularity of the border is explained by our effort to keep all of the precincts which lie within the municipal boundaries of the City of Carthage in the same district.

Jones County is split so as not to remove the incumbent from his district and also to help achieve population equality.

Webster County is split to avoid dividing the town of Maben, which lies partially in Oktibbeha County and partially in Webster County, among two districts.

Winston County is split solely to achieve the maximum possible equality of population among the districts.

In sum, the county splits are necessitated by: the population equality requirement; preservation of the majority-minority district with an appropriate percentage of black voting age population; combining as much as possible of former districts 3 and 4 in the new District 3; and avoiding having incumbents districted out of their residences.

### 3
### *Historical and Regional Interests*

In addition to the communities of interest represented by counties and municipalities, there are other communities of interest "which share common concerns with respect to one or more identifiable features such as geography, demography, ethnicity, culture, socio-economic status or trade." *Carstens,* 543 F.Supp. at 91. "[T]he preservation of regional communi-

ties of interest within a single district enhances the ability of constituents with similar regional interests to obtain effective representation of those interests." *Good v. Austin,* 800 F.Supp. at 564.

Based on the evidence presented at trial, it became apparent that there are distinct communities of interest represented by the geographical regions of the State, which are reflected in the former five-district congressional redistricting plan. Because we were reducing the districts from five to four, respecting each regional community of interest became problematic when we were required to combine two districts into a single district. At the outset, § 5 of the Voting Rights Act dictated that the protected majority-minority district be drawn first. There was very little choice as to the placement of that district, because the largest concentration of black voting age population is in the Delta and along the Mississippi River. Once we had drawn that district, the compactness principle argued that the remainder of the State be divided into a northern district, a central district, and a southern district—at least to the extent possible and practicable. Based on the distribution of the population within the State, it became further apparent that it would be necessary to include both southwest Mississippi (located in former district 4) and east central Mississippi (located in former district 3) in the same district.

In sum, we strove to respect the communities of interest represented in the former five-district plan, to the extent other more compelling circumstances allowed. In applying this factor, we considered only the interests of the residents of Mississippi, and not those of the incumbent congresspersons. In sum, given the constraints of population equality, our plan preserves as much as possible the cores of the Mississippi River/Delta region, east central Mis-

sissippi, southwest Mississippi, north Mississippi, and the Gulf Coast region.

### 4
#### Universities and Military Bases

The evidence at trial was undisputed that the four major research universities (the University of Mississippi, Jackson State University, Mississippi State University, and the University of Southern Mississippi) should be placed in separate districts so that they will not have to compete for federal funding. Our plan achieves that goal.

Under the former five-district plan, the military bases in Lowndes and Lauderdale Counties were located in former district 3. Several witnesses testified at trial regarding the importance of the military bases to the State's economy, and that it would be preferable to place those bases in separate districts so that, if both were targeted for closure, each would have a separate congressperson working to prevent closure. We found this testimony to be persuasive: A congressperson with only one military base in his or her district is much more likely to be successful in preventing its closure than a congressperson who has two military bases in his or her district. Our plan is therefore drawn with due consideration that the military bases located in Lowndes, Lauderdale, and Harrison Counties are in separate districts.

### 5
#### Growth Areas

Although much of Mississippi is rural, there are several high-growth areas. The largest of these growth areas are in DeSoto County in north Mississippi, in Hancock, Harrison, and Jackson Counties in south Mississippi, and in Hinds, Rankin, and Madison Counties in central Mississippi. We found persuasive the testimony at trial regarding the undesirability of placing several high-growth areas in the same district, because of the competition for federal funding for infrastructure. In addition, as population growth continues over time, placement of too many high-growth areas in the same district would result in malapportionment much more quickly than it would if the growth areas are distributed evenly among the districts. Accordingly, our plan is drawn with consideration that each district has at least one major growth area. District 1 contains DeSoto County, as under the former five-district plan. District 2 contains the Nissan Plant/Gluckstadt area of Madison County, as under the former five-district plan, and almost all of Hinds County, including much of the City of Jackson and the Byram and Clinton areas. District 3 contains southern Madison County and Rankin County. District 4 contains the Gulf Coast area.

### 6
#### Combination of Former Districts 3 and 4

As noted, protection of the majority-minority district as required by § 5 of the Voting Rights Act, and application of the compactness principle, dictated that the new District 3 contain a combination of the southwestern portion of the State, which was located in former district 4, and the east central portion of the State, which was located in former district 3. Accordingly, in drawing the new District 3, consideration was given to including as much of the former districts 3 and 4 in the new combined District 3 as possible, subject to the constraints of the population equality principle, the prevention of retrogression in District 2, and the neutral requirement of compactness. It seemed to us that combining old districts 3 and 4 as much as possible would have the initial effect, in our map-drawing efforts, of being less disruptive to the other three established districts as we redrew their respective lines. We also concluded that combining the two districts to the extent possible helped to achieve compactness of the new District 3, as well as the other new districts. At the

core of our reasoning, however, was an attempt to preserve intact, as much as possible, the communities of interest in southwest, east central, and central Mississippi.

The new District 3 contains all or part of fourteen counties from each of the former districts 3 and 4, respectively.

The new District 3 includes the portion of Jones County which contains the residence of the incumbent for former district 3. It includes all or part of fourteen of the nineteen counties included within former district 3: Jasper, Jones, Kemper, Lauderdale, Leake, Madison, Neshoba, Newton, Noxubee, Oktibbeha, Rankin, Scott, Smith, and Winston. It is, however, necessary to eliminate: the portions of Attala County and Wayne County that are in former district 3 for concerns of retrogression and population equality, respectively; and all of Clarke, Clay, and Lowndes Counties, primarily because of population equality.

The new District 3 includes all of Jefferson Davis County, which contains the residence of the incumbent for former district 4. It includes all or part of fourteen of the fifteen counties that were included within former district 4: Adams, Amite, Covington, Franklin, Hinds, Jefferson Davis, Jones, Lawrence, Lincoln, Marion, Pike, Simpson, Walthall, and Wilkinson. It is, however, necessary to eliminate Copiah County for reasons of population equality with District 2 and to prevent retrogression of voting rights of black residents of District 2.

## 7

### Protection of Incumbent Residences

The only political consideration that we took into account in drafting our plan was to assure that no incumbent would be required to move in order to run in the district in which he resides. *See Arizonans,* 828 F.Supp. at 688 (court should avoid unnecessary or invidious outdistricting of incumbents, because "maintenance of incumbents provides the electorate with some continuity").

## 8

### Distance of Travel Within Districts

After consideration of all of the above factors, we considered traveling distances within the districts. However, we recognized that application of the compactness principle generally minimizes the distance of travel within each congressional district. Nevertheless, we took into consideration the existing roads and highways in the State, and how that would affect the ability of a candidate, and ultimately the elected representative, to travel throughout his or her district. As is expected to occur when the number of districts is reduced from five to four, the distances of travel within the districts are increased.

The distance of travel within District 1 is approximately the same size as under the plans submitted by the Plaintiffs, and is substantially less than it is under the plans submitted by the Intervenors. The new District 2 is slightly larger than former district 2, but this is unavoidable in the light of the population deficit in former district 2, which grew more slowly than any other district in the State. We recognize that travel distances in the new District 3 are considerably greater than in either of the former districts 3 and 4. The distance of travel within new District 3 is dictated by our combining much of former districts 3 and 4 (which we have previously explained), as well as by the effort to keep the four major research universities in separate districts. The distance of travel in District 3 under our plan is, however, not as great as it is in the plans submitted by the Intervenors. The distance of travel in new District 4 is slightly greater than it is in former district 5. This is necessitated by the population equality principle as well as by our effort to include in District 3 as much of former district 4 as is feasible.

The distance of travel within new District 4 is substantially less than that within district 4 in some of the plans submitted by the Plaintiffs.

### Conclusion

In sum, the court has attempted to apply all appropriate neutral factors that are recognized by the United States Supreme Court and federal redistricting courts. As noted, these factors include, first, the constitutional demand for population equality among the districts, and secondly, the Voting Rights Act requirement that one equally populated district be drawn to include a majority of black residents of voting age. While respecting county, city and precinct lines and the compactness of each district, the court sought to give appropriate weight to the following factors: respect for historical and regional interests to the extent feasible; placement of growth areas, research universities and military bases in separate districts if otherwise practicable; inclusion of as much as possible of the former districts 3 and 4, representing the communities of interest in southwest and east central Mississippi, in the new District 3; avoiding the outdistricting of incumbents; and minimizing travel distances within the districts, consistent with the other requirements. When all feasible adjustments were made for these factors, further adjustments were necessary to satisfy one person-one vote requirements, and retrogression concerns.

### IV

### Effective Date of Plan

The Attorney General of Mississippi submitted the plan adopted by the Chancery Court, as well as the Mississippi Supreme Court's December 13 order holding that the Chancery Court had jurisdiction to adopt a congressional redistricting plan, to the United States Attorney General for preclearance on December 26, 2001, and requested expedited preclearance by January 31, 2002. The plan adopted by the Chancery Court cannot be implemented unless the Attorney General of the United States "has interposed no objection within a 60–day period following submission." 28 C.F.R. § 51.1(2). The initial 60–day period was to end on February 25, 2002. *See* 28 C.F.R. § 51.9. However, on February 14, the Department of Justice requested additional information and indicated that a new 60–day period would begin to run upon the receipt of that information. The deadline for congressional candidates to qualify to run for Congress in 2002 is March 1. *See* Miss.Code Ann. § 23–15–299(3).

A three-judge district court in New York was faced with a situation similar to the one before this court. *See Gantt,* 796 F.Supp. 681. After the special master appointed by the court had filed his proposed plan, the New York Legislature enacted a redistricting plan, which was signed by the Governor and submitted for preclearance. The court was faced with a July 9, 1992 deadline under state law for candidates to begin gathering signatures on petitions. Under those circumstances, while preclearance of the legislature's plan was pending before the Department of Justice, the court ordered that, if the plan adopted by the New York Legislature had not been precleared by 5:00 p.m. on July 8 (the day before the signature-gathering deadline), the special master's plan would be used for the 1992 congressional elections. *Id.* at 686, 697. In short, the court made clear that it did not have to wait on preclearance before it acted in order to assure that the election process proceeded on schedule.[6]

---

**6.** As it turned out, the Department of Justice precleared the state legislature's plan one week before the signature-gathering deadline.

*See Puerto Rican Legal Defense & Education Fund, Inc. v. Gantt,* 796 F.Supp. 698, 698 (E.D.N.Y.1992).

The Intervenors have urged us not to enjoin implementation of the plan adopted by the Chancery Court, and not to order that our plan be implemented, until after the expiration of the 60–day period. In addition, they have argued that we should postpone the qualifying deadline if the Attorney General requests more information or objects to the plan adopted by the Chancery Court. As we have earlier noted, such a request for additional information was made on February 14. Furthermore, the Intervenors have indicated that they intend to seek immediate relief from the Supreme Court of the United States if this court does not accept their contentions.

Nevertheless, for the reasons we have already stated, we decline to postpone the qualifying deadline. It has been the position of this court—which has been expressly conveyed to the parties, first as early as November 30, 2001, and several times since then—that this court did not intend to postpone the election process which begins on March 1. In short, everyone understood that some plan must be in place, upon which all of the parties and the voters could rely, on or before March 1. We assume that the Department of Justice has been aware of this position, at least since it received the preclearance submission on December 26, 2001. Indeed, we note that, in Hinds County Chancery Court, the Intervenors argued that a plan had to be precleared "at least a couple of weeks before March 1."

The plaintiffs and the Mississippi Republican Executive Committee have argued that, because potential candidates need time to evaluate the new district lines and to make their decisions, this court's

plan should take effect if the Chancery Court plan has not been precleared by February 15. In addition, the Plaintiffs argue that, if we wait until the expiration of the 60–day preclearance period, we will have insufficient time to consider and rule on their claims that, (1) even if the Mississippi Supreme Court's order authorizing the Chancery Court to adopt a redistricting plan, as well as the plan adopted by the Chancery Court, are ultimately precleared, we should nevertheless enjoin implementation of the Chancery Court's plan, because subsequent preclearance does not cure the violation of § 5 that occurred when the Chancery Court acted on the basis of an unprecleared change in state election law; and (2) irrespective of whether the state court plan is precleared, the Chancery Court's adoption of a plan usurps authority constitutionally delegated only to the Mississippi Legislature, in violation of Article I, § 4 of the United States Constitution, which provides, in relevant part, that "The Times, Places and Manner of Holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof . . . ." [7]

We also recognize that voters, as well as potential candidates, are experiencing confusion and frustration as a result of the uncertainties as to which redistricting plan ultimately will be implemented. We are further cognizant of the difficulties faced by persons wishing to run for Congress as independents. An individual who wishes to be placed on the ballot as an independent candidate is required to file a petition containing the signatures of not less than 200 qualified electors in the district in which he or she intends to run for office.

---

7. We consider this question to raise a serious constitutional issue, that is, whether there must be *some* legislative source that connects the state redistricting body to its authority to redistrict a state for United States congres-

sional elections. For example, in *Growe v. Emison*, the Minnesota Supreme Court, in appointing a special redistricting panel, relied on authority granted by specific (but admittedly vague) statutes.

*See* Miss.Code Ann. § 23–15–359(1)(c). The petition must be filed with the State Board of Election Commissioners no later than 5:00 p.m. on the qualifying deadline. *See* Miss.Code Ann. § 23–15–359(3). If the boundaries of the districts are uncertain until the close of business on February 25, persons who wish to run for Congress as independents would have only three days during which to gather and to present the necessary signatures to ensure their placement on the ballot.[8]

Nevertheless, we have determined that it would be premature to order the implementation of this court's plan until the Department of Justice has had the full initial 60–day period to preclear the plan adopted by the Chancery Court, and the Mississippi Supreme Court order that authorized the Chancery Court to act. Accordingly, we hold that, if the Chancery Court plan has not been precleared before the close of business on Monday, February 25, 2002, the congressional redistricting plan attached to our order of February 4, 2002, shall operate as the plan for congressional districts for the State of Mississippi for the 2002 congressional elections, and, on February 26, 2002, an injunction shall be entered directing the defendants to conduct the 2002 congressional elections pursuant to the congressional redistricting plan attached to our February 4 order.

---

8. We recognize the possibility that individuals who wish to run as independent candidates may be inconvenienced by having only three days to gather signatures. We do note, however, that there are some counties that will be in the same districts under the plan adopted by the Chancery Court and under this court's plan.